## NIAGARA HUDSON POWER CORP. *v.* LEVENTRITT.

NO. 211.

Argued December 5, 1950.—Decided January 15, 1951.

*Randall J. LeBoeuf, Jr.* argued the cause for petitioner in No. 211. With him on the brief were *Craigh Leonard* and *Lauman Martin.*

*Roger S. Foster* argued the cause for petitioner in No. 212. With him on the brief were *Solicitor General Perlman* and *John F. Davis.*

*T. Roland Berner* and *M. Victor Leventritt* argued the cause for respondent. With them on the brief was *Aaron Lewittes.*

MR. JUSTICE BURTON delivered the opinion of the Court.

These cases test the validity of the Securities and Exchange Commission's finding that a plan of reorganization is "fair and equitable" within the meaning of § 11 of the Public Utility Holding Company Act of 1935,[1] although the plan makes no provision for the participation of outstanding stock option warrants relating to the common stock of the company to be reorganized.   The basis

---

[1] "SEC. 11. (a) . . . .

"(b) It shall be the duty of the Commission . . . :

.          .          .          .          .

"(2)  To require by order, after notice and opportunity for hearing, that each registered holding company, and each subsidiary company thereof, shall take such steps as the Commission shall find necessary to ensure that the corporate structure or continued existence of any company in the holding-company system does not *unduly or unnecessarily complicate the structure, or unfairly or inequitably distribute voting power among security holders,* of such holding-company system. . . .

.          .          .          .          .

"(e) In accordance with such rules and regulations or order as the Commission may deem necessary or appropriate in the public interest or for the protection of investors or consumers, any registered holding company or any subsidiary company of a registered holding company may, at any time after January 1, 1936, submit a plan to the Commission for the divestment of control, securities, or other assets, or for other action by such company or any subsidiary company thereof for the purpose of enabling such company or any subsidiary company thereof to comply with the provisions of subsection (b). If, after notice and opportunity for hearing, the Commission shall find such plan, as submitted or as modified, *necessary to effectuate the provisions of subsection (b) and fair and equitable to the persons affected by such plan; the Commission shall make an order approving such plan;* and the Commission, at the request of the company, may apply to a court, in accordance with the provisions of subsection (f) of section 18, to enforce and carry out the terms and provisions of such plan. . . ." (Emphasis added.)   49 Stat. 820, 821, 822, 15 U. S. C. § 79k (b) and (e).

for the Commission's conclusion is that it cannot find that there is a reasonable expectation, within the foreseeable future, that the market price of the common stock will exceed the exercise price of the warrants and that, upon consideration of all the circumstances, including the market for the warrants, the Commission cannot find justification for recognizing any present value in the warrants at the expense of the common stock. For the reasons hereinafter stated, we sustain the Commission.

The Niagara Hudson Power Corporation, petitioner in No. 211, is a registered public utility holding company, incorporated under the laws of New York, whose dissolution is contemplated under the reorganization.[2] It has outstanding notes in the amount of $20,000,000; 378,875 shares of first preferred stock, of $100 par value; 105,930 shares of second preferred stock, of $100 par value; 9,580,988½ shares of common stock, of $1 par value; and Class B stock option warrants. The warrants represent options to purchase, at any time, up to 497,191⅗ shares of common stock, each warrant entitling the holder to subscribe to 1⅙ shares of common stock upon payment of $50, which is at the rate of approximately $42.86 per share.[3]

The proposed reorganization includes a dissolution plan which is conditioned upon the consummation of a

[2] For a summary of the proceedings since 1942 under § 11 (b) (2) of the Act, relating to the Niagara Hudson system, and at first relating to 26 corporate entities, see *Niagara Hudson Power Corp.*, Holding Company Act Release No. 9270, pp. 7–8.

[3] It appears from the warrant certificates that the holder of each "is entitled to purchase at any time (without limit)" shares of common stock at the price stated. It also appears from the certificates that the warrants are a second generation of warrants, having been issued in exchange for warrants of two predecessor corporations "for the purpose of preserving and continuing, as nearly as may be, the rights of the holders of said option warrants, existing at the date of consolidation, according to their respective terms."

consolidation plan, now consummated. The Commission found both plans to be "necessary to effectuate the provisions of Section 11 (b) (2) of the Act [§ 15 U. S. C. § 79k (b) (2)] and fair and equitable to the persons affected thereby . . . ." Holding Company Act Releases No. 9270, pp. 1, 57; No. 9295, p. 2. Over an objection made by the respondent, M. Victor Leventritt, as a warrant holder, the United States District Court for the Northern District of New York approved the plans and ordered them enforced. 86 F. Supp. 697. On appeal by the respondent, the Court of Appeals for the Second Circuit reversed that part of the order which relates to the warrants, and remanded the cause to the District Court for further proceedings. 179 F. 2d 615. A rehearing was denied, one judge dissenting. The Court of Appeals for the Third Circuit thereafter reached a substantially contrary result in *In re Commonwealth & Southern Corp.,* 184 F. 2d 81. Because of the conflicting nature of the decisions in the Courts of Appeals and the importance of the issue in the application of the Public Utility Holding Company Act, we granted the petitions for certiorari filed separately by the company in No. 211 and the Commission in No. 212. 340 U. S. 809.

At every stage of this proceeding opportunity has been afforded the holders of the warrants to present their claims and they have been fully presented. Respondent has not, however, brought up the record which was made before the Commission and cannot question the sufficiency of the evidence in support of the Commission's findings as to the intrinsic or investment value of the common stock or as to that of the warrants based on the likelihood of their exercise within the foreseeable future.[4] The appeal

---

[4] Such findings "are not subject to reexamination by the court unless they are not supported by substantial evidence or were not arrived at 'in accordance with legal standards.' " *Securities & Exchange Comm'n* v. *Central-Illinois Corp.,* 338 U. S. 96, 126.

attacks the authority of the Commission, as a matter of law, to conclude that, under the circumstances found by it, the dissolution plan is "fair and equitable" within the meaning of § 11 (e) of the Act, where the plan provides for no participation by the outstanding warrants despite their conceded, but low, market value. The Court of Appeals sustained that attack and said: "we cannot agree that there was any evidence 'substantial' or insubstantial to support the finding that these 'warrants' were wholly worthless." 179 F. 2d at 618.

The Commission's answer to the attack is that, within the meaning of § 11 (e) of this Act, it has discretion to approve a plan as "fair and equitable to the persons affected by such plan," without providing for the participation of the holders of any security that has no recognizable intrinsic or investment value, although it may have a market value which the Commission considers too small "as a practical matter" to be recognized. The Commission stated its conclusions in its original order as follows:

### "5. *Fairness to the Holders of the Class B Stock Option Warrants of Niagara Hudson*

"Under the plans, no provision is made for participation of the Class B stock option warrants of Niagara Hudson and all rights represented by such warrants will terminate upon the dissolution of that company.

"The option warrants entitle their holders to purchase at any time 497,191⅚ shares of Niagara Hudson common stock, each warrant entitling the holder to 1⅙ shares upon payment of $50. This is equivalent to an exercise price of $42.86 for one share. Since 1932, the Niagara Hudson or predecessor company common stock has never sold at a price higher than

18¼ and has sold as low as ⅞. During the same period, the option warrants have never sold higher than 5 and have been as low as ⅛. [Appendix F attached to the Commission's opinion shows that in 1943 they dropped further to ¹⁄₁₆, and in 1941 and 1942 to ¹⁄₃₂.] In 1948, the prices for the option warrants ranged from a high of 1 to a low of ⅛, and in 1949, from a high of ¼ to a low of ⅛.

"In considering the participation to which option warrant holders may be entitled, the test is basically the same as that applied with respect to the other types of securities, that is, what value, if any, is being given up by the surrender of the rights attaching to that security. The price of $42.86, which a holder of an option warrant would have to pay for one share of Niagara Hudson common stock, is more than 30 times the estimate we have used of $1.39 as foreseeable earnings which would be applicable to that stock on the basis of present investment if Niagara Hudson were to continue. That price is about 3.5 times the recent high market prices for the Niagara Hudson common stock of around 12 per share.

"If we were to assume that Niagara Hudson were to continue and its common stock were to sell in the future at a ratio of 15 times consolidated earnings, which would appear to be a very liberal assumption, it would require per share earnings of $2.86 to result in a price of $42.86 per share. Such earnings would represent an increase of 106% over the approximately $1.39 of earnings which we have found attributable to the present investment. On the basis of the more likely assumption that the price-earnings ratio at which the Niagara Hudson common stock would sell would be something less than 15 times,

an even greater increase in earnings would be required to attain a per share price of $42.86.

"Under all the circumstances, we cannot find that there is a reasonable expectation that the market price of Niagara Hudson's common stock would exceed the exercise price of the option warrants within the foreseeable future. Accordingly, we find that such option warrants have no recognizable value [59] and that the plans satisfy the standard of fairness and equity with respect to such option warrants in excluding them from any participation in the reorganization of Niagara Hudson." Holding Company Act Release No. 9270, pp. 46–47.

In its foregoing statement the Commission is consistent with the position it has taken as to the preferred and common stock. In accordance with the principles established in *Securities & Exchange Comm'n* v. *Central-Illinois Corp.,* 338 U. S. 96, and in *Otis & Co.* v. *Securities & Exchange Comm'n,* 323 U. S. 624, it has estimated future earnings as a guide for its determination of the intrinsic and investment value of those stocks. It has satisfied itself that the holders of them will receive, in cash or securities, an equitable equivalent of that value. The Commission's comparable duty in relation to the warrants is first to determine the extent to which they reflect the value of the common stock upon which they have an option. If, for example, the market value of the common

---

"[59] We recognize that the holders of the option warrants have a right to purchase common stock at any time, and that this perpetual feature has some present value no matter how remote or speculative the exercise of the right might be. The value to be accorded that right, however, in this case, is so small that as a practical matter we would not be justified in recognizing it for the purposes of a Section 11 reorganization. *Cf. Electric Power & Light Corporation,* —— S. E. C. —— (1949), Holding Company Act Release No. 8889."

stock closely approaches the exercise price stated in the warrants, or if there is ground for a reasonable expectation that the two may coincide within the foreseeable future, then the warrants would have an intrinsic and investment value directly related to the common stock. Under those circumstances, we assume no plan of reorganization would be fair or equitable within the meaning of § 11 (e) of the Act that did not recognize that value and provide an equitable equivalent for it.[5]

On the other hand, if the market value of the common stock is less than $15 per share and there is no ground for a reasonable expectation that, within the foreseeable future, the value will exceed $15 per share, then an option to buy it at, for example, $1,000 per share obviously would be worthless if the measure of its value depends only upon its convertibility into common stock. With such facts, it is difficult to see how the Commission could justify either the continuance of the warrants or any compensation for them at the expense of the existing common stock. The difference between the example last given and the facts of this case is merely one of degree. Where the line is to be drawn is a matter for the expert judgment of the Commission. The limits of its discretion are also narrowed here by the fact that the future earnings of a public utility company are limited by law to a conservative rate of return upon a governmentally ascertained rate base.

Respondent's objection in this case is not primarily to the Commission's computation of the investment value of

---

[5] In *In re Electric Power & Light Corp.*, Holding Company Act Release No. 8889, aff'd 176 F. 2d 687, the Commission approved a plan allocating shares of common stock to the warrant holders at a ratio of one share of stock for three warrants, in recognition of estimated earnings which indicated the value of the stock in the foreseeable future as between $25 and $30 per share, whereas the exercise price for it stated in the warrants was $25 per share.

the warrants insofar as that value is based upon the relationship between their exercise price and the value of the common stock. His claim is rather that the Commission must, as a matter of law, give greater recognition than it has to the market value of the warrants themselves. He contends that the warrants have a valuable "perpetual feature" because the options in the warrants may be exercised "at any time (without limit)." From this premise he reasons that the Commission, as a matter of law, must recognize some present value in the warrants because of the infinite possibilities which inhere in any option that reaches into the infinite future. His premise is partially false because the option in the warrants does not extend beyond the life of the common stock and there is no guaranty of the length of that life. On the other hand, the "perpetual feature" of the option does afford ground for anticipating its survival beyond the short period which limits ordinary estimates of investment values. It reaches beyond the foreseeable into the unexpected and the unpredictable.

The value of this "perpetual feature" may be called the premium value of the warrants as distinguished from their investment value. It takes into account such possibilities as that of a runaway inflation, an unprecedented accumulation of undistributed surplus earnings, an unlikely liberalization of standards of public utility regulation, a surprise discovery of oil on company property, etc. These are considerations which a buyer of "perpetual" warrants on the open market might consider as a basis for speculation in them. Furthermore, because warrants are among the lowest priced of all securities and because their market price tends to fluctuate with the market price of the stock to which they are related, they permit speculation on market trends with a minimum

investment.[6]  A purchaser thus may be willing to pay a nominal price for a warrant which has no investment value, on the mere chance that it may be saleable in a rising market.[7]  This, however, does not provide an adequate reason for allowing a value to the warrants, at the expense of the common stock, in a reorganization under this Act.

This reorganization of a registered public utility holding company is one brought about in the interest of the public. The company is subjected to it by its status as a public utility and by its registration as a holding company under the Act.  In determining the fairness and equity of compensation to be allowed holders of warrants, the Commission is not bound as a matter of law, any more than in the case of other securities, to limit itself precisely to the values which the market recognizes.  The informed judgment of the Commission, rather than that of the

---

[6] See 1 Dewing, The Financial Policy of Corporations (4th ed. 1941), 254; Graham & Dodd, Security Analysis (1934), 258–259, 548–550; Hoagland, Corporation Finance (2d ed. 1938), 177.

[7] What a trader is willing to pay for a warrant is determined by his own estimate of the "prospects of *change.*"  Graham & Dodd, Security Analysis (1934), 547.  "The privilege [conferred by a warrant upon its holder] constitutes a call upon the future prosperity of the company, and its value will depend upon the hope that the market price of the stock will rise above the stipulated subscription price before the right expires."  Guthmann & Dougall, Corporate Financial Policy (2d ed. 1948), 145.

Berle & Means, in The Modern Corporation and Private Property (1932), stress the difficulty of fixing a value for warrants.  "[T]hey maintain market values, which to the uninitiated seem inexplicable."  P. 183.  Market quotations for warrants have led "certain observers in the New York market to suggest that the real result of an option warrant is to create a pure gambling counter . . . ."  P. 184.  "[A]t the time when the stock purchase warrants are issued, particularly if they are perpetual, it is almost beyond human wisdom to set any fair price on such options."  *Ibid.*  To the same effect, see Graham & Dodd, pp. 568–570.

market, has been designated by the Act as the appropriate guide to fairness and equity within the meaning of the Act. Under the standards approved by this Court, that informed judgment looks for investment values on a going-concern basis measured primarily by the Commission's estimates of earnings within the foreseeable future. In the *Otis* case, *supra,* this Court accepted the Commission's approval of participation by common stock in a reorganization under the Act, even though the assets of the company to be reorganized were insufficient to satisfy the charter liquidation preference of the preferred stock. This Court there accepted the Commission's estimate that in approximately 15 years the corporation's earnings would be sufficient to pay dividends on the common stock. On the other hand, in the *Central-Illinois* case, *supra,* we expressly rejected the "colloquial equity" approach of the District Court, which placed special emphasis upon market history.

In the absence of abuse of its discretion, the Commission's approval of a plan is as lawful and binding when it recognizes a value of zero for a security as when it selects any other figure. The cash allowance it gives to one security it must take from another. In each case, it must determine the fairness and equity of the plan to all who are affected. We conclude, therefore, that in the present instance the Act does not require proof that the warrants are wholly worthless and without all market value in order to sustain the Commission's judgment that the plan is fair and equitable when it denies participation to them. It is enough that the Commission, within its discretion, has given the warrants careful consideration and that under all the circumstances, including their market value, has found the plan to be fair and equitable within the meaning of § 11 of the Act. Moreover, we find no lack of authority in analogous fields of reorganization for sustaining the general principle that a class of

securities may go unrecognized in a reorganization when informed estimates of future earnings indicate that they have no investment value.[8]

The judgment of the Court of Appeals, accordingly, is reversed and that of the District Court is affirmed.

*Reversed.*

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE BLACK joins, dissenting.

I would have the Securities and Exchange Commission take another look, for the reasons indicated in Judge Learned Hand's opinion below, 179 F. 2d 615.

MR. JUSTICE JACKSON took no part in the consideration or decision of these cases.

---

[8] In *Group of Institutional Investors* v. *Chicago, M., St. P. & P. R. Co.*, 318 U. S. 523, the Court approved a railroad reorganization under § 77 of the Bankruptcy Act, 49 Stat. 911, 11 U. S. C. § 205, in which preferred and common shareholders were wiped out because their equity was not justified by earnings prospects. And in reorganizations under former § 77B of the Bankruptcy Act, 48 Stat. 912, "The criterion of earning capacity is the essential one . . . ." *Consolidated Rock Products Co.* v. *Du Bois*, 312 U. S. 510, 526. See 6 Collier on Bankruptcy (14th ed. 1947), 3849–3859.